Jason Harrow
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice application forthcoming*)
Emily Gerrick*
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

Bradley S. Schrager
Nevada State Bar No. 10217
Daniel Bravo
Nevada State Bar No. 13078
WOLF, RIFKIN, SHAPIRO,
SHULMAN & RABKIN LLP
3773 Howard Hughes Parkway
Suite 590 South
Las Vegas, NV 89169
bschrager@wrslawyers.com
dbravo@wrslawyers.com
(702) 341-5200

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| PATRICK HABLE,<br><br>    Plaintiff,<br><br>    vs.<br><br>BENN GODENZI,<br><br>    Defendant. | Case No.:<br><br>**COMPLAINT** |

**Preliminary Statement**

1. Plaintiff Patrick Hable bought ECOMI tokens from Benn Godenzi in December 2021 and January 2022 in exchange for $12 million while Godenzi was in Nevada, his home. ECOMI are blockchain-based securities issued by a Singapore-based company called Ecomi, which operates a digital-collectibles business. As Godenzi and Hable were negotiating the first sale, Godenzi told Hable that he had worked with the company for two and a half years, and specifically had designed the unique features that made ECOMI an attractive investment, "but unfortunately the [Ecomi] team didn't pay our contract for a year which led to a lawsuit and of course a settlement." Shortly before the negotiations, Godenzi released a statement through YouTube assuring the market that he had in fact resolved his legal disputes with Ecomi. Hable relied on these statements when he purchased the tokens.

2. On June 7, 2022, *Businessdesk*, a newspaper in New Zealand, where Ecomi's founder and CEO lives and works, published a story revealing that the dispute between Godenzi and Ecomi was ongoing in New Zealand. Although the parties had settled a Singapore action in 2021, the settlement agreement in that case had explicitly excluded ongoing litigation in New Zealand. In fact, Ecomi had counterclaimed in the New Zealand litigation, alleging that Godenzi defrauded the company, and Godenzi continued to pursue payment for work he claims to have done.

3. Had Hable known that Godenzi was involved in significant, ongoing litigation with the company issuing the tokens that he was selling, whose tokens he had himself designed, and that he was alleged to have defrauded that company, Hable would not have purchased the tokens. Hable brings this Action to rescind the sales because they constitute securities fraud in violation of Section 10(b)(5) of the Securities Act (and SEC Rule 10b-5 implementing that Act), securities fraud under Nevada law, and fraud under Nevada law.

## Parties

4. Patrick Hable is a German national resident in Portugal. He was an early investor in Bitcoin and has been involved in blockchain assets and technologies for years. He currently operates a data-services company that provides analysis tools to institutional investors.

5. Benn Godenzi is an Australian national who permanently resides in Nye County, Nevada. Godenzi owns and operates a company called MB Technology registered in the British Virgin Islands. The company is not a party here.

## Jurisdiction and Venue

6. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States.

7. This Court has general personal jurisdiction over Godenzi because his domicile is Nevada. This Court has specific personal jurisdiction over Godenzi because, as alleged below, he committed the fraud alleged here from within the State of Nevada.

8. Venue is proper in this District because the acts complained of were committed in this District.

## Background on The Relevant Digital Assets

9. A crypto asset is a form of digital asset based on a network that is distributed across a large number of computers. Bitcoin is the most well-known type of crypto asset. The value of some assets, such as Bitcoin, fluctuates with respect to the U.S. Dollar and all other fiat currencies. Other assets are so-called stablecoins because their value is pegged to a government-issued currency. U.S. Dollar Coin, for example, is issued by a company that holds ordinary U.S. dollars in a U.S. bank account sufficient to back each U.S. Dollar Coin, such that those coins are effectively equivalent to U.S. dollars.

10. Different crypto assets are typically designated by three- or four-letter

symbols, as stocks are. Bitcoin's is BTC. ECOMI's is OMI.

11. The network of computers that securely and publicly record the transactions of a given crypto asset is called a blockchain. There are many blockchains that record transactions of a variety of different crypto assets. The two blockchains on which OMI tokens have traded are called GoChain and Ethereum.

12. Most crypto asset tokens are fungible and tradeable and are not generally distinguishable from each other. But some, called non-fungible tokens, or NFTs, are unique: Using a special protocol on the Ethereum or GoChain blockchains, users can create individual scarce assets with unique properties. In the last few years, a vibrant market has arisen for NFTs as collectors' items.

13. Ecomi, as relevant here, operates a marketplace for digital collectibles called Veve.[1] Through Veve, users can buy, sell, and trade digital collectibles and other virtual goods; display their collections to others in a personal digital showroom; and use other technology to play games using digital collectibles. Ecomi keeps custody of its users' assets and maintains a centralized record of who owns what and charges fees on every transaction. In addition to operating a marketplace for transactions in digital collectibles, Ecomi itself sells digital collectibles. In 2021, it announced partnerships with brands like Disney and Marvel to issue digital collectibles. According to a trade publication in 2021, Veve was among the highest-grossing digital-collectibles applications in the world.

14. In 2018, Ecomi issued the OMI token through what the company described as an "Initial Coin Offering" or ICO. (Ecomi also sold ordinary equity in its corporate entities to investors.) Ecomi programmed OMI to have a maximum possible supply of 750 billion tokens. It initially created 450 billion, immediately selling 150

---

[1] Ecomi, a corporation based in Singapore, is operated by Orbis Blockchain Technologies, a company in New Zealand. Because the business operates under the name "Ecomi," it will be referred to as such in this Complaint.

billion to investors and setting aside 300 billion.

15. Transactions between users on Ecomi's digital-collectibles platform are priced in dollars or other currency, not in OMI. According to a paper issued by Ecomi when OMI was first released, "representing payment in familiar terms (fiat) is key for adoption" because it ensures that "users will not be affected by . . . fluctuations in the OMI token value."

16. Nonetheless, the value of OMI is tied to the activity on Ecomi's Veve marketplace and its own sales of digital collectibles, and, therefore, to the success of the business. Every time a transaction is conducted on Veve, it is tracked by Ecomi. At the end of each day, Ecomi staff determine the volume of sales occurring on Veve that day and then "burn"[2] an amount of OMI from the company's reserves equivalent in value (based on that day's prevailing market price for OMI) to 2.5% of the total amount sold that day. This means that, for every $100 in transactions on a given day, $2.50 worth of OMI is taken out of circulation forever by Ecomi.

17. Only 750 billion OMI tokens will ever exist. OMI is, therefore, a deflationary asset. The more transactions take place, the fewer OMI will exist in the marketplace, hopefully increasing the price of OMI in the long term.

18. As more OMI are taken out of circulation forever, in theory the price of each remaining OMI will rise as a result, all other things being equal.

19. This design effectively ties OMI holders' fortunes to those of the Veve marketplace and its primary sales of digital collectibles—every day's Veve transactions result in the economic equivalent of a share buyback for OMI holders—and thus functions effectively like an automatic share buy-back or dividend in a traditional company.

---

[2] As a technological matter, one "burns" a crypto asset by sending it to a wallet address on the relevant blockchain to which no one has access, thus permanently removing it from the circulating supply of that asset.

20. Holders of OMI can sell them on various online crypto exchanges as well as over the counter. There is a robust secondary market for OMI: As of this Complaint, the daily volume of OMI traded on crypto exchanges is around $600,000 and its market capitalization is worth approximately $388 million.

## **Godenzi's False Statements About His Litigation**

21. In 2018, Ecomi hired Godenzi, through his company, MB Technology, as a high-ranking advisor. His principal role was to advise the company on how to structure OMI. In this role, Godenzi created at least the basic concept behind OMI as a deflationary token that is destroyed when purchases, priced in currencies, are made by users.

22. In 2020, Godenzi sued Ecomi in Singapore claiming that he was not paid for his services. Separately from that lawsuit, Godenzi also brought a lawsuit in New Zealand against Ecomi's New Zealand parent company. Shortly after filing the Singapore action, Godenzi obtained an order in Singapore freezing Ecomi's (and its founder's) assets. Godenzi then applied to the High Court of New Zealand for an order freezing Ecomi's New Zealand assets based on the pending Singapore litigation. That order was granted initially on October 8, 2020, and renewed on November 4, 2020.

23. In the order renewing the freezing order, the High Court explained that Godenzi and his company "claim[] that [Ecomi] failed to pay it for work on a digital finance management platform" and that Ecomi contented that the contract had been satisfied and alleged, in the "nature of a counterclaim," "[an] agreement by the applicant to remit some crypto-currency" to Ecomi. Subsequent news reports show that MB Technology claimed $3.2 million in damages, alleging that "Ecomi had falsely induced it to invest 356.69 bitcoin and 170 Ethereum in the [Veve] project."

24. In 2021, Godenzi and Ecomi settled the Singapore litigation by private agreement.

25. The litigation made potential buyers of OMI wary, which was bad for

both Ecomi and Godenzi, who frequently sold large quantities of OMI.

26. On online forums, news of the litigation was met with dread by owners of OMI. For example, on a Reddit.com forum for fans of Ecomi, a user who posted an article about the Singapore litigation was told "If it's settled we don't need the FUD [fear, uncertainty, and doubt][3] and you should delete the post."

27. On July 30, 2021, Godenzi released a chat message on YouTube that he had with a commentator named Foster Hilt. In that chat, Godenzi sought to alleviate negative market information arising from another YouTube video posted by a commentator named Cavell Anderson in which Anderson alleged that Godenzi "scammed" Ecomi and in which Anderson discussed the Singapore litigation. In his July 30 chat, Godenzi wrote, in reference to the litigation with the company, that "we *had* a dispute *and moved on*." (emphases added).

28. He further explained that "[o]ur contract payment was delayed for about a year. We were often told we would be paid soon, tomorrow or next week etc. Eventually I told them I would have to take legal action if it wasn't paid. . . . Eventually I had no other choice but to start the legal action . . . . And that's what happened. *The dispute was settled and we parted ways amicably*. Specific details of the settlement cannot be discussed but I am willing to do a joint press release with Ecomi to clarify. I always remained available to help the token grown and am still available now." (emphasis added).

29. In fact, Godenzi's dispute with Ecomi was ongoing in New Zealand as Godenzi of course knew.

30. In New Zealand, court documents are not generally accessible to the public. OMI purchasers, therefore, had no way to verify Godenzi's statements regarding his disputes with Ecomi.

---

[3] Crypto users use the phrase "FUD" to describe more or less any negative attention drawn to a crypto asset.

31. Court documents in New Zealand are usually published upon a judgment of the court, though. One such judgment eventually revealed that the Singapore settlement included a clause reading "[f]or the avoidance of doubt, this full and final [release] clause *does not apply to the New Zealand . . . Action* [against Ecomi's New Zealand corporation]." (emphasis added).

32. *Businessdesk* eventually explained, relying on the published judgment, that "MB Technology [still] wants damages, claiming . . . Ecomi agreed to transfer up to some 11.8 billion tokens to it if MB invested or acquired shares in [Ecomi's New Zealand company] . . . of $1.075 million US . . . ."

**Hable Relies on Godenzi's Statements and Purchases OMI Tokens**

33. On December 17, 2021, Hable and Godenzi discussed a potential purchase of OMI in an online chat forum. Hable wrote "I learned that you were responsible for the OMI tokenomics [an industry term for the design structure of a crypto token] which I find very interesting." Godenzi wrote back "Yes me and my team incubated [E]comi from the business model to the token ecosystem . . . . We did that for 2.5 years but unfortunately the team didn't pay our contract for a year which led to a lawsuit *and of course a settlement*." (emphasis added). Hable wrote "So you were paid in token but not in cash, correct?" To which Godenzi responded "I can't disclose our payment terms but we own a lot of tokens. I was also the largest investor in the token."

34. Believing that Godenzi's litigation with Ecomi was in the past, Hable ultimately purchased several billion OMI tokens from Godenzi in exchange for $12 million worth of USDC over two transactions, the first in December 2021 and the second in January 2022.

35. Had Hable known that Godenzi's litigation with Ecomi was ongoing, he never would have purchased the tokens. The fact of the litigation is generally important to the market for the tokens, as evidenced by the commentary described

above. Godenzi—who is himself the seller of the tokens—designed the tokens and was a high-ranking advisor for Ecomi for years, and he himself felt the need to tell the market that everything was copacetic between him and Ecomi.

36. Further, Hable is supportive of Ecomi and did not want to do business with someone who was actively fighting the company.

37. Hable still has the OMI tokens he purchased from Godenzi. He stands ready to tender them to Godenzi in exchange for the original purchase price.

### OMI Is an "Investment Contract" Under U.S. Law

38. As relevant here, to be a security under U.S. law, an investment contract must involve (a) the investment of money (b) in a common enterprise (c) with the reasonable expectation of profits (d) reliant on the efforts of others. Individuals purchase OMI tokens from Ecomi to participate in a common enterprise with an expectation of profit derived solely from the efforts of Ecomi.

39. Because it is issued by a non-U.S. company without any known meaningful targeting of the U.S. market, OMI is not required to be registered as a security with the Securities Exchange Commission and nothing in this Complaint alleges that Ecomi violated any laws, let alone U.S. securities laws. But Godenzi's sales are nonetheless subject to the anti-fraud rules of the United States securities laws because he incurred irrevocable liability to deliver OMI tokens while within the United States. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948 (9th Cir. 2018).

### Investment of Money

40. Investors acquire OMI directly from Ecomi in exchange for U.S. dollars or other government-issued currencies. They accordingly invest money when they purchase OMI. This investment of money also occurs on the secondary market, as was the case here.

### Common Enterprise

41. The success or failure of any investment in OMI is tied entirely to the

success or failure of any other person's investment in OMI, and (as explained in more detail below) is dependent on the success or failure of the Veve marketplace, which is operated entirely by Ecomi.

## With The Reasonable Expectation of Profits

42. According to Ecomi's whitepaper, OMI was initially sold to the public before the Veve marketplace became operational.

43. Purchasers of OMI need not be users of Veve. OMI was available via an initial coin offering before Veve was operational and it was in fact purchased by non-users in amounts well in excess of those necessary to facilitate transactions on Veve.

44. Ecomi's "team, advisors, and board members," according to the Whitepaper, hold 150 billion OMI and the company has kept another 150 billion for "business development."

45. A secondary market for OMI became active shortly after its issuance through listings with major crypto exchanges.

46. Although the original design of OMI gives it some uses beyond speculation—holders of largest quantities of OMI are given special benefits in the Veve marketplace—its primary function in fact is as an investment and a revenue-raising device. Transactions on Veve result in a decrease in the supply of OMI, thus putting upward pressure on its price, but those transaction are conducted in government-issued currencies. OMI's function, then, has nothing to do with the functioning of the Veve ecosystem; it is exclusively an investment.

47. The deflationary design of OMI is such that purchasers reasonably expect to derive profits from its appreciation. Every Veve transaction results in a decrease of the OMI supply. The more transactions on the marketplace—in other words, the more successful the business—the faster the decrease in OMI's supply, in theory increasing the relative value of purchased OMI and giving investors an effective right to participate in the earnings from Ecomi's business.

10
COMPLAINT

**Derived From the Efforts of Others**

48. The more transactions take place on Veve, the more OMI is destroyed and, all else equal, the higher OMI's price. At the same time, the more transactions take place on Veve, the greater the success of the marketplace as a whole and, therefore, the higher OMI's price. Purchasers of OMI, then, rely on the efforts of Veve to expect profits.

49. Ecomi management's efforts are central to the success of the entire OMI enterprise. The Veve marketplace, for example, makes licensing deals with major intellectual-property holders to create digital collectibles out of their IP. Those licensing deals are a major selling point for Veve, perhaps its crucial competitive advantage. And those deals are all made by Veve management.

50. OMI holders have no role in the operation of the Veve marketplace by virtue of their status as holders. Even if they choose to buy digital collectables on the Veve marketplace, to do so their transactions are executed in assets other than OMI.

**Claims for Relief**

*First Claim For Relief*

**Securities Fraud in Violation of Exchange Act Section 10(b)(5) and Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5**

51. Plaintiffs incorporate all prior paragraphs by reference.

52. OMI is an "investment contract" under *SEC v. Howey Co.*, 328 U.S. 293 (1946), because it involves the investment of money in a common enterprise with a reasonable expectation of profits derived solely from the efforts of others.

53. Godenzi made a misstatement of material fact when he told Hable, through YouTube and one-on-one, that his litigation with Ecomi had been amicably resolved when it was in fact ongoing.

54. Hable relied on Godenzi's misstatements when purchasing OMI from him, and Hable's reliance was reasonable.

55. Godenzi told Hable and the market as a whole that his litigious dispute with Ecomi was resolved because he intended to sell OMI tokens that he would otherwise have been unable to sell at his desired price or, alternatively or additionally, because he knew that Hable would not buy the tokens if he knew the truth.

56. Godenzi made his statements using the internet, an instrumentality of interstate commerce.

57. Hable is, therefore, entitled to the equitable remedy of rescission because he would not have entered into the transaction absent Godenzi's fraud.

## *Second Claim For Relief*

### Violation of the Nevada Securities Act, NRS 90.570(2)

58. Plaintiffs incorporate all prior paragraphs by reference.

59. OMI is an "investment contract" under Nevada law because it involves the investment of money in a common enterprise with a reasonable expectation of profits derived solely from the efforts of others.

60. Godenzi made a misstatement of material fact when he told Hable, through YouTube and one-on-one, that his litigation with Ecomi had been amicably resolved when it was in fact ongoing.

61. Hable relied on Godenzi's misstatements when purchasing OMI from him, and Hable's reliance was reasonable.

62. Godenzi told Hable and the market as a whole that his litigious dispute with Ecomi was resolved because he intended to sell OMI tokens that he would otherwise have been unable to sell at his desired price or, alternatively or additionally, because he knew that Hable would not buy the tokens if he knew the truth.

63. Hable is, therefore, entitled to the equitable remedy of rescission under NRS 90.660(1)(f) because he would not have entered into the transaction absent

Godenzi's fraud.

### Third Claim For Relief

### Fraud

64. Godenzi made a false representation of fact to Hable when he told Hable, through YouTube and one-on-one, that his litigation with Ecomi had been amicably resolved when it was in fact ongoing.

65. Godenzi knew his representations were false because he was in fact a party to ongoing litigation.

66. Godenzi made these false representations with the intent to induce Hable to buy OMI in reliance on the statements.

67. Hable's reliance on Godenzi's statements was justifiable—because of the generally private nature of New Zealand court documents, Hable had no way to verify the truth or falsity of Godenzi's statements independently.

68. Hable has suffered damages as a result of Godenzi's fraud: Since Hable purchased the tokens which he otherwise would not have purchased, they have declined in value by approximately 79%.

69. Hable is, therefore, entitled to rescind his purchase of OMI because it was based on Godenzi's fraud.

### Prayer for Relief

A. Plaintiffs Patrick Hable respectfully requests:

B. An order requiring Godenzi to give Hable twelve million U.S. Dollar Coins upon Hable's tender of the OMI tokens he purchased from Godenzi;

C. In the alternative, an award of money damages sufficient to put Hable in a financial position equivalent to the one he would be in had he not purchased OMI tokens calculated based on the fair-market value of OMI at the time of judgment;

D. An award of statutory interest under NRS 90.660(1)(f);

E.  An award of reasonable attorneys' fees and costs under NRS 90.660(1)(f);

F.  Any other relief deemed just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

DATED this 2nd day of December, 2022.

    Respectfully submitted,

    */s/ Bradley S. Schrager*
    Bradley S. Schrager
    Nevada State Bar No. 10217
    Daniel Bravo
    Nevada State Bar No. 13078
    WOLF, RIFKIN, SHAPIRO, SHULMAN & RABKIN LLP
    3773 Howard Hughes Parkway
    Suite 590 South
    Las Vegas, NV 89169

    Jason Harrow
    (*pro hac vice application forthcoming*)
    GERSTEIN HARROW LLP
    3243B S. La Cienega Blvd.
    Los Angeles, CA 90016

    Charles Gerstein
    (*pro hac vice application forthcoming*)
    Emily Gerrick*
    (*pro hac vice application forthcoming*)
    GERSTEIN HARROW LLP
    810 7th Street NE, Suite 301
    Washington, DC 20002

    *Attorneys for Plaintiff*

    **Admitted to practice in Texas only. Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(8), with supervision by Charles Gerstein.*