Jason Harrow
(*Admitted pro hac vice*)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*Admitted pro hac vice*)
Emily Gerrick*
(*Admitted pro hac vice*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002
charlie@gerstein-harrow.com
(202) 670-4809

Bradley S. Schrager
Nevada State Bar No. 10217
Daniel Bravo
Nevada State Bar No. 13078
WOLF, RIFKIN, SHAPIRO, SHULMAN
& RABKIN LLP
3773 Howard Hughes Parkway
Suite 590 South
Las Vegas, NV 89169
bschrager@wrslawyers.com
dbravo@wrslawyers.com
(702) 341-5200

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| PATRICK HABLE,<br><br>       Plaintiff,<br><br>  vs.<br><br>BENN GODENZI,<br><br>       Defendant. | Case No.: 2:22-cv-02012-GMN-BNW<br><br>**FIRST AMENDED COMPLAINT** |

**FIRST AMENDED COMPLAINT**

1

### Preliminary Statement

2      1.      Plaintiff Patrick Hable bought ECOMI tokens from Benn Godenzi in December

3  2021 and January 2022 in exchange for $12 million while Godenzi was in Nevada, his home.

4  ECOMI are blockchain-based securities issued by a Singapore-based company called Ecomi,

5  which operates a digital-collectibles business. As Godenzi and Hable were negotiating the first

6  sale, Godenzi told Hable that he had worked with the company for two and a half years, and

7  specifically had designed the unique features that made ECOMI tokens an attractive investment,

8  "but unfortunately the [Ecomi] team didn't pay our contract for a year which led to a lawsuit and

9  of course a settlement." Shortly before the negotiations, Godenzi released a statement through

10  YouTube assuring the market that he had in fact resolved his legal disputes with Ecomi. Hable

11  relied on these statements when he purchased the tokens.

12      2.      On June 7, 2022, *Businessdesk*, a newspaper in New Zealand, where Ecomi's co-

13  founder and CEO lives and works, published a story revealing that the dispute between Godenzi

14  and Ecomi was ongoing in New Zealand. Although the parties had settled a Singapore action in

15  2021, the settlement agreement in that case had explicitly excluded ongoing litigation in New

16  Zealand. In fact, Ecomi had counterclaimed in the New Zealand litigation, alleging that Godenzi

17  defrauded the company, and Godenzi continued to pursue payment for work he claims to have

18  done. In the six weeks before the article was published, while the information was likely reaching

19  the market, the price of ECOMI tokens fell 41%. In the six days immediately after the article was

20  published, the price of ECOMI tokens dropped another 36%. The total price drop likely

21  attributable to the news was over 70%.

22      3.      Had Hable known that Godenzi was involved in significant, ongoing litigation with

23  the company issuing the tokens that he was selling, whose tokens he had himself designed as an

24  advisor to Ecomi, and that he was alleged to have defrauded that company, Hable would not have

25  purchased the tokens. Hable brings this Action to rescind the sales because they constitute

26  securities fraud in violation of Section 10(b)(5) of the Securities Act (and SEC Rule 10b-5

27  implementing that Act), securities fraud under Nevada law, and fraud under Nevada law.

28

**Parties**

4.      Patrick Hable is a German national resident in Portugal. He was an early investor in Bitcoin and has been involved in blockchain assets and technologies for years. He currently operates a data-services company that provides analysis tools to institutional investors.

5.      Benn Godenzi is an Australian national who permanently resides in Incline Village, Nevada. Godenzi owns and operates a company called MB Technology registered in the British Virgin Islands. The company is not a party here.

**Jurisdiction and Venue**

6.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States.

7.      This Court has general personal jurisdiction over Godenzi because his domicile is Nevada. This Court has specific personal jurisdiction over Godenzi because, as alleged below, he committed the fraud alleged here from within the State of Nevada.

8.      Venue is proper in this District because the acts complained of were committed in this District.

**Background on The Relevant Digital Assets**

9.      A crypto asset is a form of digital asset based on a network that is distributed across a large number of computers. Bitcoin is the most well-known type of crypto asset. The value of some assets, such as Bitcoin, fluctuates with respect to the U.S. Dollar and all other fiat currencies. Other assets are so-called stablecoins because their value is pegged to a government-issued currency. U.S. Dollar Coin for example, is issued by a company that holds ordinary U.S. dollars in a U.S. bank account sufficient to back each U.S. Dollar Coin, such that those coins are effectively equivalent to U.S. dollars.

10.      Different crypto assets are typically designated by three- or four-letter symbols, as stocks are. Bitcoin's is BTC. U.S. Dollar Coin's is USDC. ECOMI's is OMI.

11.      The network of computers that securely and publicly record the transactions of a given crypto asset is called a blockchain. There are many blockchains that record transactions of

a variety of different crypto assets. The two blockchains on which OMI tokens have traded are called GoChain and Ethereum.

12.     Most crypto asset tokens are fungible and tradeable and are not generally distinguishable from each other. But some, called non-fungible tokens, or NFTs, are unique: Using a special protocol on the Ethereum or GoChain blockchains, users can create individual scarce assets with unique properties. In the last few years, a vibrant market has arisen for NFTs as collectors' items.

13.     Ecomi, as relevant here, operates a marketplace for digital collectibles called Veve.[1] Through Veve, users can buy, sell, and trade digital collectibles and other virtual goods; display their collections to others in a personal digital showroom; and use other technology to play games using digital collectibles. Ecomi keeps custody of its users' assets and maintains a centralized record of who owns what and charges fees on every transaction. In addition to operating a marketplace for transactions in digital collectibles, Ecomi itself sells digital collectibles. In 2021, it announced partnerships with brands like Disney and Marvel to issue digital collectibles. According to a trade publication in 2021, Veve was among the highest-grossing digital-collectibles applications in the world.

14.     In 2018, before the Veve marketplace opened to investors, Ecomi issued the OMI token through what the company described as an "Initial Coin Offering" or ICO. (Ecomi's parent company also sold ordinary equity in its corporate entities to investors.) Ecomi programmed OMI to have a maximum possible supply of 750 billion tokens. It initially created 450 billion, immediately selling 150 billion to investors, issuing 150 billion to Ecomi's founders, board members, and advisors, and setting aside 300 billion for the company's reserve.

15.     On Veve, transactions between users are priced in dollars or other currency, not in OMI. According to a paper issued by Ecomi when OMI was first released, "representing payment

---

[1] Ecomi, a corporation based in Singapore, is operated by Orbis Blockchain Technologies, a company in New Zealand. Because the business operates under the name "Ecomi," it will be referred to as such in this Complaint.

in familiar terms (fiat) is key for adoption" because it ensures that "users will not be affected by . . . fluctuations in the OMI token value."

16.     Nonetheless, the value of OMI is tied to the activity on Ecomi's Veve marketplace and its own sales of digital collectibles, and, therefore, to the success of the business. Every time a transaction is conducted on Veve, it is tracked by Ecomi. At the end of each day, Ecomi staff determine the volume of sales occurring on Veve that day and then "burn"[2] an amount of OMI from the company's reserves equivalent in value (based on that day's prevailing market price for OMI) to 2.5% of the total amount sold that day. This means that, for every $100 in transactions on a given day, $2.50 worth of OMI is taken out of circulation forever by Ecomi.

17.     Only 750 billion OMI tokens will ever exist. OMI is, therefore, a deflationary asset. The more transactions take place, the fewer OMI will exist in the marketplace, hopefully increasing the price of OMI in the long term.

18.     As more OMI are taken out of circulation forever, in theory the price of each remaining OMI will rise as a result, all other things being equal.

19.     This design effectively ties OMI holders' fortunes to those of the Veve marketplace and its primary sales of digital collectibles—every day's Veve transactions result in the economic equivalent of a share buyback for OMI holders—and thus functions effectively like an automatic share buy-back or dividend in a traditional company.

20.     Holders of OMI can sell them on various online crypto exchanges as well as over the counter. There is a robust secondary market for OMI: As of this Complaint, the daily volume of OMI traded on crypto exchanges is around $600,000 and its market capitalization is worth approximately $388 million.

/ / /

/ / /

---

[2] As a technological matter, one "burns" a crypto asset by sending it to a wallet address on the relevant blockchain to which no one has access, thus permanently removing it from the circulating supply of that asset.

**FIRST AMENDED COMPLAINT**

**Godenzi's False Statements About His Litigation**

21.     In 2018, Ecomi hired Godenzi, through his company, MB Technology, as a high-ranking advisor. His principal role was to advise the company on how to structure OMI. In this role, Godenzi created at least the basic concept behind OMI as a deflationary token that is destroyed when purchases, priced in currencies, are made by users.

22.     In 2020, Godenzi sued Ecomi in Singapore claiming that he was not paid for his services. Separately from that lawsuit, Godenzi also brought a lawsuit in New Zealand against Ecomi's New Zealand parent company. Shortly after filing the Singapore action, Godenzi obtained an order in Singapore freezing Ecomi's (and its founders') assets. Godenzi then applied to the High Court of New Zealand for an order freezing Ecomi's New Zealand assets based on the pending Singapore litigation. That order was granted initially on October 8, 2020, and renewed on November 4, 2020.

23.     In the order renewing the freezing order, the High Court explained that Godenzi and his company "claim[] that [Ecomi] failed to pay it for work on a digital finance management platform" and that Ecomi contended that the contract had been satisfied and alleged, in the "nature of a counterclaim," "[an] agreement by the applicant to remit some crypto-currency" to Ecomi. Subsequent news reports show that MB Technology claimed $3.2 million in damages, alleging that "Ecomi had falsely induced it to invest 356.69 bitcoin and 170 Ethereum in the [Veve] project."

24.     In 2021, Godenzi and Ecomi settled the Singapore litigation by private agreement.

25.     The litigation made potential buyers of OMI wary, which was bad for both Ecomi and Godenzi, who frequently sold large quantities of OMI.

26.     News of the litigation was met with dread by owners of OMI. For example, when popular YouTube personality Cavell Anderson talked about the litigation on his channel, many in the "Ecomi community" expressed fear that sharing information about the litigation would negatively affect the price of OMI.

27.     On January 8, 2021, an "Ecomi Community Interview" was held in which Anderson was invited to speak with Godenzi publicly. The person organizing the interview expressed frustration that the litigation was "being put out" in the open and that such information was consequentially "the focus of what everyone in the community is dealing on. We're not focusing on, you know, the exciting news of possibly Spider Man or something being announced, no one knows that, you know, the Veve team did all this effort to release this on socials and I just I feel like at least in my world, in my socials, this [Godenzi's suit] has taken up all of it. The videos, the views that I'm seeing going out are all about, you know, Benn [Godenzi] did this to the community, Benn [Godenzi] did that to the community, and, you know, don't invest in Ecomi because Benn [Godenzi] did this."

28.     The video of this conversation was taken down, but the audio was posted on YouTube on August 1, 2021. In the YouTube comments for the posted audio file, OMI token holders echoed frustration with news of the litigation being spread, with one commenter writing that "[C]avell [Anderson] is spreading FUD [fear, uncertainty, and doubt[3]] with no evidence and is fucking my investment with all this drama." One commentator asked a question about the original video, and the person who posted the audio advised that they might be able to find the information on the Ecomi "telegram," referring to a private messaging group, and added that they "wouldn't really post them on [YouTube] [be]cause that would be just throwing gas at any fire."

29.     Similarly, on a Reddit.com forum for fans of Ecomi, a user who posted an article about the Singapore litigation was told "If it's settled we don't need the FUD and you should delete the post."

30.     On July 30, 2021, Godenzi released a chat message on YouTube that he had with a commentator named Foster Hilt. In that chat, Godenzi sought to alleviate negative market information arising from public discussions about the Singapore litigation. In his July 30 chat,

---

[3] Crypto users use the phrase "FUD" to describe more or less any negative attention drawn to a crypto asset that could decrease the asset's value.

Godenzi wrote, in reference to the litigation with the company, that "we *had* a dispute *and moved on*." (emphases added).

31.    He further explained that "[o]ur contract payment was delayed for about a year. We were often told we would be paid soon, tomorrow or next week etc. Eventually I told them I would have to take legal action if it wasn't paid. . . . Eventually I had no other choice but to start the legal action . . . . And that's what happened. *The dispute was settled and we parted ways amicably*. Specific details of the settlement cannot be discussed but I am willing to do a joint press release with Ecomi to clarify. I always remained available to help the token grow and am still available now." (emphasis added).

32.    Hable saw and heard of this video after it was released.

33.    He discussed it with others in the ECOMI community, where it was well known and the subject of many discussions on various social media platforms.

34.    However, even though Godenzi told the market that his litigation was resolved, Godenzi's dispute with Ecomi was in fact ongoing in New Zealand, as Godenzi of course knew.

35.    In New Zealand, court documents are not generally accessible to the public. OMI purchasers, therefore, had no way to verify Godenzi's statements regarding his disputes with Ecomi.

36.    Court documents in New Zealand are usually published upon a judgment of the court, though. One such judgment eventually revealed that the Singapore settlement included a clause reading "[f]or the avoidance of doubt, this full and final [release] clause *does not apply to the New Zealand . . . Action* [against Ecomi's New Zealand corporation]." (emphasis added).

37.    *Businessdesk* eventually explained, relying on the published judgment, that "MB Technology [still] wants damages, claiming . . . Ecomi agreed to transfer up to some 11.8 billion tokens to it if MB invested or acquired shares in [Ecomi's New Zealand company] . . . of $1.075 million US . . . ."

38.    The newspaper—and the market generally, as explained further below—treated the two claims against Ecomi as intertwined, writing without interruption that: "A Court of Appeal

ruling describes how, in a suit filed in Singapore, MB Technology argued Ecomi had failed to pay it for work on the digital finance management platform. Ecomi argued the contract was complete. In the US $3.2 million claim, MB Technology also said Ecomi had falsely induced it to invest 356.69 Bitcoin and 170 Ethereum in the project."

39.    In other words, Godenzi was in fact still pursuing payment from Ecomi, despite telling the market—through a video that Hable saw and relied on—that he had resolved his "dispute" about payment.

40.    On information and belief, the Singapore litigation and the New Zealand litigation were closely related.

41.    Unlike information disseminated by publicly traded companies—which are governed by rules forbidding selective disclosure—information disseminated by crypto companies does not always reach the market quickly or in one sitting. For example, the *BusinessDesk* article was behind a paywall and was slow to be disseminated to OMI holders, but eventually many found out.

42.    And the market reaction to the news was drastic. On June 7, 2022, the day before the article came out, OMI was trading for $.00163228 per token. By June 13, OMI was trading for $.001038 per token, representing a decline of 36% in just six days.

43.    News of the litigation likely spread among ECOMI insiders in the weeks before the article was published and weakened the token. In the six weeks prior to publication of the article, the price of OMI fell 41%; representing a total decline of over 70% in the weeks prior to the article being published and in the six days after publication.

**Hable Relies on Godenzi's Statements and Purchases OMI Tokens**

44.    On December 17, 2021, Hable and Godenzi discussed a potential purchase of OMI in an online chat forum. Hable wrote "I learned that you were responsible for the OMI tokenomics [an industry term for the design structure of a crypto token] which I find very interesting." Godenzi wrote back "Yes me and my team incubated [E]comi from the business model to the token ecosystem . . . . We did that for 2.5 years but unfortunately the team didn't pay our contract for a

year which led to a lawsuit *and of course a settlement*." (emphasis added). Hable wrote "So you were paid in token but not in cash, correct?" To which Godenzi responded "I can't disclose our payment terms but we own a lot of tokens. I was also the largest investor in the token."

45.     Believing that Godenzi's litigation with Ecomi was in the past, Hable and Godenzi negotiated to exchange USDC for OMI starting in December 2021. On December 17, 2021, Godenzi wrote that his "team" had "agreed to [a] 10% [discount to that day's spot price of OMI] if you still wanted to run it today but they won't be doing more than 1b for now. Let me know if you still wanted to do it."

46.     Hable wrote back "ok, this price?" and quoted that day's market price.

47.     Godenzi wrote back "yes that's okay," accepting Hable's offer, forming a contract, and committing himself irrevocably to exchange one billion OMI for 10% less than the day's spot price.

48.     Hable ultimately purchased several billion OMI tokens from Godenzi in exchange for $12 million worth of USDC over two transactions, the first in December 2021 and the second in January 2022.

49.     Had Hable known that Godenzi's litigation with Ecomi was ongoing, he never would have purchased the tokens. The fact of litigation is generally very important to the market for the tokens, as evidenced by the commentary described above and the significant price decline when news of Godenzi's ongoing lawsuit was revealed. Godenzi—who is himself the seller of the tokens—designed the tokens and was a high-ranking advisor for Ecomi for years, and he himself felt the need to tell the market that everything was copacetic between him and Ecomi.

50.     Further, Hable is supportive of Ecomi and did not want to do business with someone who was actively fighting the company.

51.     Hable still has the OMI tokens he purchased from Godenzi. He stands ready to tender them to Godenzi in exchange for the original purchase price.

///

///

**OMI Is an "Investment Contract" Under U.S. Law**

52.    As relevant here, to be a security under U.S. law, an investment contract must involve (a) the investment of money (b) in a common enterprise (c) with the reasonable expectation of profits (d) reliant on the efforts of others. Individuals purchase OMI tokens from Ecomi to participate in a common enterprise with an expectation of profit derived solely from the efforts of Ecomi.

53.    Because it is issued by a non-U.S. company without any known meaningful targeting of the U.S. market, OMI is not required to be registered as a security with the Securities Exchange Commission and nothing in this Complaint alleges that Ecomi violated any laws, let alone U.S. securities laws. But Godenzi's sales are nonetheless subject to the anti-fraud rules of the United States securities laws because he incurred irrevocable liability to deliver OMI tokens while within the United States. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948 (9th Cir. 2018).

*Investment of Money*

54.    Investors acquire OMI directly from Ecomi in exchange for U.S. dollars or other government-issued currencies. They accordingly invest money when they purchase OMI. This investment of money also occurs on the secondary market, as was the case here.

*Common Enterprise*

55.    The success or failure of any investment in OMI is tied entirely to the success or failure of any other person's investment in OMI—all of the tokens are identical and fungible—and (as explained in more detail below) is dependent on the success or failure of the Veve marketplace, which is operated entirely by Ecomi.

56.    The CEO and co-founder of Ecomi has explained that the company cares about the price of OMI as much as anybody in the Ecomi Community, and that the company carefully considers how its decisions, such as decisions relating to the company "burning" (i.e., removing from circulation) OMI tokens, will affect the price of OMI.

/ / /

/ / /

**FIRST AMENDED COMPLAINT**

_With The Reasonable Expectation of Profits_

57.     According to Ecomi's whitepaper, OMI was initially sold to the public before the Veve marketplace became operational.

58.     Purchasers of OMI need not be users of Veve. OMI was available via an initial coin offering before Veve was operational and it was in fact purchased by non-users in amounts well in excess of those necessary to facilitate transactions on Veve.

59.     Ecomi's "team, advisors, and board members," according to the Whitepaper, hold 150 billion OMI and the company has kept another 150 billion for "business development."

60.     A secondary market for OMI became active shortly after its issuance through listings with major crypto exchanges.

61.     Although the original design of OMI gives it some uses beyond speculation—holders of largest quantities of OMI are given special benefits in the Veve marketplace—its primary function in fact is as an investment and a revenue-raising device. Transactions on Veve result in a decrease in the supply of OMI, thus putting upward pressure on its price, but those transactions are conducted in government-issued currencies. OMI's function, then, has nothing to do with the functioning of the Veve ecosystem; it is exclusively an investment.

62.     The deflationary design of OMI is such that purchasers reasonably expect to derive profits from its appreciation. Every Veve transaction results in a decrease of the OMI supply. The more transactions on the marketplace—in other words, the more successful the business—the faster the decrease in OMI's supply, in theory increasing the relative value of purchased OMI and giving investors an effective right to participate in the earnings from Ecomi's business.

63.     This mechanism, which was designed by Godenzi, is identical to "stock buybacks" in the traditional financial world, in which companies repurchase their own stocks from investors, thus driving up the price of those stocks. In fact, members of the Ecomi Community refer to this deflationary tool as "buybacks" when discussing their investments online. Ecomi co-founder and COO Daniel Crothers has also referred to the mechanism as "buybacks."

**FIRST AMENDED COMPLAINT**

64.     When asked about whether people should use OMI tokens or fiat currency at an online event for Ecomi Community members, Crothers advised, "Well, OMI may go up in price, fiat will stay as is, so I know what I would choose haha."

65.     At that same event, Crothers was asked whether Ecomi generates profits in a way that creates a "win-win to both invester [sic] and your project." Crothers replied, "The OMI token has increased 6000% so I'd say we're heading towards a win-win [smiling emoticon]."

### *Derived From the Efforts of Others*

66.     The more transactions take place on Veve, the more OMI is destroyed and, all else equal, the higher OMI's price. At the same time, the more transactions take place on Veve, the greater the success of the marketplace as a whole and, therefore, the higher OMI's price. Purchasers of OMI, then, rely on the efforts of Veve to expect profits.

67.     Ecomi management's efforts are central to the success of the entire OMI enterprise. The Veve marketplace, for example, makes licensing deals with major intellectual-property holders to create digital collectibles out of their IP. Those licensing deals are a major selling point for Veve, perhaps its crucial competitive advantage. And those deals are all made by Veve management.

68.     Nearly every time Ecomi has announced a major licensing deal or other promotion, OMI investors celebrate online and YouTube personalities with thousands of followers post videos speculating that the price of OMI could rise drastically as a result.

69.     OMI holders have no role in the operation of the Veve marketplace by virtue of their status as holders. Even if they choose to buy digital collectables on the Veve marketplace, to do so their transactions are executed in assets other than OMI.

### **Claims for Relief**

*First Claim For Relief: Securities Fraud in Violation of Exchange Act Section 10(b)(5) and Rule 10b-5, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5*

70.     Plaintiffs incorporate all prior paragraphs by reference.

71.     OMI is an "investment contract" under *SEC v. Howey Co.*, 328 U.S. 293 (1946), because it involves the investment of money in a common enterprise with a reasonable expectation of profits derived solely from the efforts of others.

72.     Godenzi made a misstatement of material fact when he told Hable, through YouTube and one-on-one, that his litigation with Ecomi had been amicably resolved when it was in fact ongoing.

73.     Hable relied on Godenzi's misstatements when purchasing OMI from him, and Hable's reliance was reasonable.

74.     Godenzi told Hable and the market as a whole that his litigious dispute with Ecomi was resolved because he intended to sell OMI tokens that he would otherwise have been unable to sell at his desired price or, alternatively or additionally, because he knew that Hable would not buy the tokens if he knew the truth.

75.     Godenzi made his statements using the internet, an instrumentality of interstate commerce.

76.     Hable is, therefore, entitled to the equitable remedy of rescission because he would not have entered into the transaction absent Godenzi's fraud.

### *Second Claim For Relief: Violation of the Nevada Securities Act, NRS 90.570(2)*

77.     Plaintiffs incorporate all prior paragraphs by reference.

78.     OMI is an "investment contract" under Nevada law because it involves the investment of money in a common enterprise with a reasonable expectation of profits derived solely from the efforts of others.

79.     Godenzi made a misstatement of material fact when he told Hable, through YouTube and one-on-one, that his litigation with Ecomi had been amicably resolved when it was in fact ongoing.

80.     Hable relied on Godenzi's misstatements when purchasing OMI from him, and Hable's reliance was reasonable.

81.     Godenzi told Hable and the market as a whole that his litigious dispute with Ecomi was resolved because he intended to sell OMI tokens that he would otherwise have been unable to sell at his desired price or, alternatively or additionally, because he knew that Hable would not buy the tokens if he knew the truth.

82.     Hable is, therefore, entitled to the equitable remedy of rescission under NRS 90.660(1)(f) because he would not have entered into the transaction absent Godenzi's fraud.

### *Third Claim For Relief: Fraud*

83.     Godenzi made a false representation of fact to Hable when he told Hable, through YouTube and one-on-one, that his litigation with Ecomi had been amicably resolved when it was in fact ongoing.

84.     Godenzi knew his representations were false because he was in fact a party to ongoing litigation.

85.     Godenzi made these false representations with the intent to induce Hable to buy OMI in reliance on the statements.

86.     Hable's reliance on Godenzi's statements was justifiable—because of the generally private nature of New Zealand court documents, Hable had no way to verify the truth or falsity of Godenzi's statements independently.

87.     Hable has suffered damages as a result of Godenzi's fraud: Since Hable purchased the tokens which he otherwise would not have purchased, they have declined in value by approximately 79%.

88.     Hable is, therefore, entitled to rescind his purchase of OMI because it was based on Godenzi's fraud.

### **Prayer for Relief**

Plaintiff Patrick Hable respectfully requests:

- An order requiring Godenzi to give Hable twelve million U.S. Dollar Coins upon Hable's tender of the OMI tokens he purchased from Godenzi;

**FIRST AMENDED COMPLAINT**

- In the alternative, an award of money damages sufficient to put Hable in a financial position equivalent to the one he would be in had he not purchased OMI tokens calculated based on the fair-market value of OMI at the time of judgment;
- An award of statutory interest under NRS 90.660(1)(f);
- An award of reasonable attorneys' fees and costs under NRS 90.660(1)(f);
- Any other relief deemed just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

DATED this 17th day of February, 2023.

Respectfully submitted,

*/s/ Bradley S. Schrager*
Bradley S. Schrager, Nevada State Bar No. 10217
Daniel Bravo, Nevada State Bar No. 13078
WOLF, RIFKIN, SHAPIRO, SHULMAN & RABKIN LLP
3773 Howard Hughes Parkway
Suite 590 South
Las Vegas, NV 89169

Jason Harrow (*admitted pro hac vice*)
GERSTEIN HARROW LLP
3243B S. La Cienega Blvd.
Los Angeles, CA 90016

Charles Gerstein (*admitted pro hac vice*)
Emily Gerrick* (*admitted pro hac vice*)
GERSTEIN HARROW LLP
810 7th Street NE, Suite 301
Washington, DC 20002

*Attorneys for Plaintiff*

*\*Admitted to practice in Texas only. Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(8), with supervision by Charles Gerstein.*

**FIRST AMENDED COMPLAINT**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of February, 2023, a true and correct copy of the **FIRST AMENDED COMPLAINT** was served via the United States District Court CM/ECF system on all parties or persons requiring notice.

By: */s/ Dannielle R. Fresquez*

Dannielle R. Fresquez, an Employee of
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP

17

**FIRST AMENDED COMPLAINT**