Charles E. Gianelloni, Esq.
Nevada Bar No. 12747
Alexis R. Wendl, Esq.
Nevada Bar No. 15351
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile:  (702) 784-5252
Email: cgianelloni@swlaw.com
        awendl@swlaw.com

THE CASTANEDA LAW FIRM, PLLC
Rebecca L. Castaneda, Esq.
Florida Bar No. 1007927
*Admitted Pro Hac Vice*
506 North Armenia Avenue
Tampa, FL 33609
Telephone: (813) 694-7780
Email:  rebecca@castlf.com

LAW OFFICES OF MICHAEL JASON LEE,
APLC
Michael Jason Lee, Esq.
California Bar No. 206110
*Pro Hac Vice Pending*
4660 La Jolla Village Drive, Suite 100
San Diego, CA 92122
Telephone: (858) 550-9984
Email:  michael@mjllaw.com

*Attorneys for Defendant Benn Godenzi*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| PATRICK HABLE,<br><br>              Plaintiff,<br><br>    v.<br><br>BENN GODENZI,<br><br>              Defendant. | Case No. 2:22-cv-02012-GMN-BNW<br><br>**DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** |

Defendant, Benn Godenzi ("Godenzi"), moves for an order dismissing the entirety of the First Amended Complaint ("FAC") (ECF No. 23) filed by Plaintiff, Patrick Hable ("Motion").  This Motion is based on the FAC, the memorandum of points and authorities below, the Motion for Judicial Notice and attached exhibits (ECF No. 27), and any argument the Court may entertain.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  <u>INTRODUCTION</u>**

The instant lawsuit involves inadequate allegations of fraud in relation to the private party sale of $12 million worth of a cryptocurrency known as ECOMI ("OMI" or "OMI tokens").

On January 30, 2023, Godenzi filed a motion to dismiss the initial complaint.  Instead of

defending that pleading, Plaintiff filed an equally defective FAC.  The FAC contains the same three causes of action as the original complaint: (1) securities fraud pursuant to Rule 10(b)(5); (2) securities fraud pursuant to NRS 90.570(2); and (3) common law fraud.  As discussed further herein, all three claims are again insufficiently pled, and warrant dismissal with prejudice for several reasons.

To start, Plaintiff is subject to the heightened pleadings standards of FRCP 9(b) as well as the exacting requirements of the Private Securities Litigation Reform Act ("PSLRA") because the FAC is grounded in federal securities fraud violations.  The FAC fails to comply with either of those heightened pleading requirements.

Critically, the purported fraud alleged by the FAC is based on undeniably truthful statements Godenzi made regarding a Singapore lawsuit he settled with the issuer of the OMI tokens, an entity known as "Ecomi."  Plaintiff contends the truthful statements are nevertheless fraudulent because Godenzi did not also mention he was involved in an unrelated lawsuit regarding an investment he made in Ecomi's parent company in New Zealand.  That litigation was related to an alleged investment agreement between MB Technology – a British Virgin Islands company Godenzi worked under – and Ecomi's parent.  The public disclosure of that lawsuit allegedly did not occur until June 7, 2022, when *BusinessDesk*, a paywall-restricted newspaper based in New Zealand, published an article about the New Zealand action.

Against this background, the FAC attempts to allege a loosely structured fraud-on-the-market theory.  Fundamentally, however, Plaintiff cannot establish loss causation.  This is because Plaintiff contends the majority of the OMI token price drop began ***6 weeks prior*** to the public disclosure of the New Zealand action.  As a matter of both common sense and law, a public disclosure cannot be the cause of a loss that preceded the disclosure.

Additionally, a review of the token price following the June 7, 2022 publication reveals *no* market reaction to the news because there was no material increase in the volume of OMI trading on June 7 as compared to other days and the two days after the publication.  In fact, shortly after *BusinessDesk* published the article, OMI's price was higher than it was before the article.  Any price drop encountered by OMI in the weeks leading up to the publication of the article are more

plausibly explained by a highly publicized market downturn of the entire crypto asset industry.

While these loss causation problems are fatal to all of Plaintiff's claims, the mortal flaws of the FAC do not end there. The FAC likewise fails to establish the materiality of the New Zealand action and provides no allegations that suggest a reasonable buyer would believe the New Zealand action altered the total mix of information regarding OMI. In addition, the FAC suffers from incurable falsity, scienter, and reliance deficiencies necessary to support Plaintiff's fraud claim.

Lastly, the FAC impermissibly seeks to apply the securities laws extraterritorially. The FAC's new allegations more strongly suggest what was already apparent from the original complaint – that the actual seller was not Godenzi, but a foreign entity, and that Plaintiff simply cannot plead the domestic touchpoints that would support the application of U.S. securities laws.

For these reasons, and those that follow, Godenzi respectfully requests this Motion be granted in its entirety.

## II.  FACTUAL BACKGROUND

### A.  THE OMI TOKEN

As alleged in the FAC, OMI is a cryptocurrency issued by a Singapore-based company called "Ecomi." ECF No. 23 at ¶1.

The FAC alleges Ecomi operates "Veve" (actually "VeVe"), a marketplace for "NFTs" or non-fungible tokens, which are unique digital assets such as one-of-a-kind digital artwork. *Id.* at ¶12. Through VeVe, users can buy, sell, and trade digital collectibles and other virtual goods; display their collections to others in a personal digital showroom; and use other technology to play games using digital collectibles. *Id.* at ¶13. Ecomi also sells its own digital collectibles and has partnered with brands such as Disney and Marvel to issue and create NFTs. *Id.* Ecomi keeps custody of its users' assets and maintains a centralized record of ownership and charges fees on each transaction. *Id.*

In 2018, Ecomi issued the OMI token and programmed OMI to have a maximum possible supply of 750 billion OMI tokens, of which, 450 billion tokens were available for sale. *Id.* at ¶14-15. According to the FAC, the value of OMI tokens is tied to the activity in the VeVe marketplace. *Id.* at ¶16. Every time a transaction is conducted on VeVe, it is tracked by Ecomi.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

*Id.* At the end of each day, a certain number of 300 billion unissued OMI tokens are then burned – thereby reducing the number of tokens that could potentially become available for circulation. *Id.* The number of burned OMI tokens is based on the number of transactions that have occurred in the marketplace. *Id.* The FAC alleges that the burning of OMI tokens creates scarcity, which, in turn, increases the price of OMI tokens. *See id.* at ¶17.

Plaintiff alleges he purchased OMI tokens from Godenzi in December 2021 and January 2022 in exchange for $12,000,000 worth of another cryptocurrency, USDC. *Id.* at ¶48. Plaintiff contends he was defrauded into purchasing OMI tokens by way of certain statements and omissions purportedly made by Godenzi regarding litigation between himself and Ecomi. *See id.* at ¶49.

**B.  ALLEGED LITIGATION INVOLVING GODENZI, ECOMI AND OTHER ENTITIES**

**1.  Singapore Action**

According to the FAC, Godenzi filed a lawsuit in Singapore in 2020 against Ecomi for non-payment of compensation he was owed for two and a half years of service as a top advisor to the company (the "Singapore Action"). *Id.* at ¶¶21–22. Notably, the FAC is factually inaccurate in that the Singapore Action was not brought by Godenzi, but rather, was brought by non-party MB Technology for non-payment of monies owed to it for advisory services. *See* Exs. 1–3 to ECF No. 27, *MB Technology Ltd. v. Ecomi Tech. PTE Ltd. et al.* [2020] SLR, No. HC/S 633/2020, Notice of Discontinuance/Withdrawal (Dec. 10, 2020), Notice of Discontinuance (Dec. 16, 2020), Order of Court (Dec. 16, 2020) (collectively, "Singapore Action Exhibits").

MB Technology was the designer of the "tokenomics" (*i.e.*, the design structure of a crypto token) of the OMI tokens, ECF No. 23 at ¶21, and alleged it was owed 64.5 billion OMI tokens due under an advisor agreement and was owed a refund of $115,000 under an exchange listing agreement. Ex. 4 to ECF No. 27, *MB Technology, Ltd. v. Orbis Blockchain Technologies, Ltd.,* CIV-2020-404-1541, Judgment of Jagose J. [Defendants' Applications for strike-out and summary judgment] (June 1, 2022) at ¶12. Shortly after filing the Singapore Action, MB Technology obtained an order in Singapore freezing Ecomi's assets. ECF No. 23 at ¶22.

MB Technology then commenced a mirroring suit in New Zealand and applied to the High Court of New Zealand for an order freezing Ecomi's New Zealand assets. *See id.* The New Zealand

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4

court entered an order freezing Ecomi's assets on August 21, 2020 and renewed it on November 4, 2020. *See id.* (The FAC inaccurately claims the freezing order was first entered on October 8, 2021.)

In 2021, MB Technology and Ecomi settled the Singapore Action and the mirroring New Zealand action pursuant to a private settlement agreement. *Id.* at ¶24. The assets of Ecomi were then subsequently unfrozen and the Singapore Action was discharged. *See* Exs. 1–3 to ECF No. 27, Singapore Action Exhibits.

In his FAC, Plaintiff vaguely claims the Singapore Action made potential buyers of OMI "wary," which was apparently bad for Ecomi and Godenzi, "who frequently sold large quantities of OMI." *See* ECF No. 23 at ¶25. As examples of this wariness, the FAC refers to a purported January 1, 2021 "Ecomi Community Interview," wherein the unnamed person organizing the interview "expressed frustration" regarding the litigation and a subsequent August reposting of this YouTube conversation. *Id.* at ¶27. The FAC also refers to an anonymous commenter to this YouTube video, who purportedly said, the news of the Singapore Action "is fucking my investment." *Id.* at ¶28. Finally, the FAC refers to an undated Reddit.com post wherein another anonymous commenter posted "we don't need the FUD [meaning Fear, Uncertainty and Doubt] and you should delete the post." *Id.* at ¶29. Importantly, the FAC does not allege there was any OMI token price drop relating to this purported "news" of the Singapore Action. *See id.*

## 2. The New Zealand Action

The FAC also broadly alleges that a lawsuit separate from the Singapore Action was brought in New Zealand against "Ecomi's New Zealand corporation" (the "New Zealand Action"). *Id.* at ¶22. The FAC does not state who this New Zealand corporation is, nor does it allege when this lawsuit was brought, or when Ecomi was even added as a party. The FAC also does not claim the New Zealand Action had any effect on the value or operations of Ecomi or the VeVe marketplace.

According to publicly available court filings, the New Zealand Action involved an investment MB Technology made in a separate New Zealand entity called Orbis Blockchain Technology, Ltd. ("Orbis"). *See* Ex. 4 to ECF No. 27, Judgment of Jagose J. MB Technology alleges it paid Orbis $1.075 million pursuant to a share and subscription transfer agreement. *See*

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1   *id.*  As part of the agreement, MB Technology alleges it was to receive 11.8 billion OMI tokens

2   from Orbis in May of 2020, but it never did.  *See id.*

3         Even so, Plaintiff purportedly bases his understanding of the New Zealand Action upon the

4   *BusinessDesk* article published on June 7, 2022 and a judgment issued by the New Zealand court

5   on June 1, 2022.  *See* ECF No. 23 at ¶¶ 36–43.  The FAC does not attach either document, however,

6   they are both referenced and misleadingly quoted.  Both documents are attached to the Motion for

7   Judicial Notice (ECF No. 27) as Exhibits 4–5.

8         Compared  side-by-side,  the  material  differences  between  what  was  actually  written  by

9   *BusinessDesk*, and what Plaintiff represents the article to say in the FAC, are striking:

| Actual *BusinessDesk* Excerpt (Ex. 5 to ECF No. 27) (emphasis added) | Plaintiff's Allegation (ECF No. 23 at ¶37) (emphasis added) |
|---|---|
| MB Technology **wants damages**, **claiming Orbis or Ecomi** agreed to transfer up to some 11.8 billion tokens to it if MB invested or acquired shares in **Orbis** to a bitcoin equivalent of US $1.075m . . . . | *BusinessDesk* eventually explained, relying on the published judgment, that MB Technology **[still] wants damages, claiming . . . Ecomi** agreed to transfer up to some 11.8 billion tokens to it if MB invested or acquired shares in **[Ecomi's New Zealand company]** . . . of $1.075 million US . . . . |

16         For the avoidance of doubt, the *BusinessDesk* article does not state MB Technology "still"

17   wants damages – that misleading characterization was simply added by Plaintiff.  *See* Ex. 5 to ECF

18   No. 27, Victoria Young, *Kiwi Judge Keeps Crypto Battle Alive*, BusinessDesk (June 7, 2022).  Nor

19   does the article claim MB Technology wants damages against "Ecomi."  *See id*.  Rather, the article

20   states "MB Technology wants damages, claiming Orbis *or* Ecomi agreed to transfer" OMI tokens.

21   *Id.*  The article also does not claim said damages were sought for an investment made in "Ecomi's

22   New Zealand company."  *Id.*  Rather, the article states said damages are sought for an investment

23   made in "Orbis," which is nowhere described as "Ecomi's company."  *See id.*  Indeed, even the

24   FAC itself does not describe "Orbis" as Ecomi's company, but rather, describes Orbis as Ecomi's

25   "parent company."  *See* ECF No. 23 at ¶22.  Notably, the FAC wholly removed any reference to

26   Orbis from its selective excerpting and misquoting of the *BusinessDesk* article.  *See id.*

27         Plaintiff then contends, on information and belief, that "the Singapore litigation and the

28   New Zealand litigation were closely related."  *Id.* at ¶40.  However, he does not explain what he

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

bases this understanding on or what claims the two lawsuits shared in common.

To the contrary, the Singapore Action involved a payment for services dispute regarding MB Technologies' advisory contributions toward the creation of the OMI tokens and a dispute concerning an exchange listing agreement.  Orbis was not a party to the Singapore litigation.  *See* Ex. 4 to ECF No. 27, Judgment of Jagose J.  The Singapore Action also resulted in the freezing of Ecomi's assets in both Singapore and New Zealand.  *Id.* at ¶ 2.  The New Zealand Action, on the other hand, related to an investment MB Technology made in Orbis and did not involve payment for services.  *See id.* at ¶1.  The New Zealand Action also did not result in the freezing of Ecomi assets.  *See id.*  In other words, these two lawsuits are separate and distinct.

Moreover, the publicly available New Zealand judgment (that the FAC selectively quotes from but fails to attach) *clearly states* the two lawsuits were distinct.  Specifically, the judgment provides that:

> The discontinued proceedings and this proceeding are relatively distinct: the former related to MB Technology's compensation in OMI tokens (or reimbursement) for its advisory and exchange listing services to Ecomi; the latter relates to MB Technology's share subscription and transfer investments in Orbis, for which it also was to acquire OMI tokens as a 'bonus' for such investment.  Nothing in MB Technology's compensation for its provision of services to Ecomi appears to have required it to invest in Orbis. *Id.* at ¶18.

> MB Technology's first cause of action now in this proceeding does not repeat the discontinued proceedings' claims of advisor and exchange listing agreements' breach. *Id.* at ¶17.

## C. GODENZI MADE TRUTHFUL STATEMENTS REGARDING THE LITIGATION WITH ECOMI

With that background, the FAC alleges Godenzi defrauded Plaintiff into purchasing OMI tokens *vis-a-vis* two separate statements concerning the lawsuits.  *See* ECF No. 23 at ¶3.  The first purportedly fraudulent statement is – even according to the allegations of the FAC itself – indisputably true.  Specifically, paragraph 33 of the FAC alleges the following communications were made between Godenzi and Plaintiff:

> [Plaintiff] wrote "I learned that you were responsible for the OMI tokenomics [an industry term for the design structure of a crypto token] which I find very interesting."  Godenzi wrote back "Yes me and my team incubated [E]comi from the business model to the token ecosystem . . . . We did that for 2.5 years but unfortunately the team didn't pay our contract for a year which led to a lawsuit *and of course a settlement.*'

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

(emphasis added).

According to the FAC, Godenzi informed Plaintiff that his team was not paid for two and a half years of work, which led to a lawsuit and an eventual settlement. *See id.* This statement made by Godenzi, however, was true. According to the allegations of the FAC, there was a lawsuit filed relating to the non-payment of money for services rendered and that lawsuit did settle. *Id.* at ¶¶22-24.

The second statement referenced in the FAC is also true and involves a written chat between Godenzi and YouTube commentator Foster Hilt that was later publicized with Godenzi's consent in a YouTube video posted by Mr. Hilt. In this chat, Godenzi purportedly stated that "we had a dispute and moved on." *Id.* at ¶30. He also further explained by stating:

> Our contract payment was delayed for about a year. We were often told we would be paid soon, tomorrow or next week etc. Eventually I told them I would have to take legal action if it wasn't paid . . . . Eventually I had no other choice but to start the legal action . . . . And that's what happened. The dispute was settled and we parted ways amicably.

*Id.* at ¶31.

Again, it is not untrue that there was a dispute regarding non-payment for services rendered by MB Technology to Ecomi. It is also not untrue that this dispute regarding non-payment was settled. Further, there is nothing in the FAC to suggest Ecomi and Godenzi did not part ways amicably and had not moved on from their dispute regarding payment for MB Technology's services.

There is no allegation that the marketplace for OMI tokens generally relied on these Godenzi statements published in this YouTube video. Further, the FAC does not state the YouTube video was widely viewed or discussed by current or potential owners or sellers of OMI tokens.

**D.   THE FAC FAILS TO ADEQUATELY ALLEGE THE NEW ZEALAND ACTION HAD AN EFFECT ON THE PRICE OF OMI TOKENS**

The FAC further attempts to allege that the New Zealand Action was responsible for the drop in OMI tokens beginning in or around late April/early May 2022, and that according to Plaintiff, OMI experienced a drop of roughly 70% over roughly the six weeks preceding the publication of the *BusinessDesk* article, and in the six days following publication. *Id.* at ¶43.

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

The news of the New Zealand Action was not published until June 7, 2022, i.e., **six weeks** after the late April/early May 2022 price drop began.  If the measure is taken from June 7, 2022, the OMI token actually increased in the days following the publication.  *See* Ex. 7 to ECF No. 27, Historical Listing of OMI Token Price (OMI price listings for June 7–9, 2022).  Specifically, on the day that the *BusinessDesk* article was published (June 7, 2022), the OMI token closed at $0.001523.  *See id.*  The very next day, on June 8, 2022, the OMI token actually *increased* in price and closed at $0.001577.  *See id.*  The day after, on June 9, 2022, the price was still higher than the June 7, 2022 price and the OMI token closed at $0.00153.  *See id.*  It did briefly fall in mid-June; however, it fully recovered and was trading at greater than its June 7, 2022 price by early July.  *See id.* (OMI price listings for July 7, 2022).

At the same time, the trading volume of OMI – effectively "how much" of a given asset was traded on any given day—showed no marked difference on June 7, 2022 than any other day. *See id.*  OMI price listings for June 7–9, 2022, in fact declined in the days following the *BusinessDesk* article.  While the OMI token price began dropping into mid-June 2022 along with the rest of the market, it rapidly recovered and was closing at higher than the June 7, 2022 price by early July 2022 when it closed at $0.001571.  *Id.* (OMI price listings for July 7, 2022).  Because the July high was over $0.0019, *id.* (OMI price listings for July 24, 2022), and exceeded $0.001577 several times after, Plaintiff seemingly had several opportunities to sell his assets for more than they were worth before the *BusinessDesk* article but failed to do so.

The FAC wholly ignores the historical pricing of OMI tokens as well as the well-known crash of the crypto asset and attendant NFT market in May and June of 2022.  *See* Exs. 8–17 to ECF No. 27 (various data).

On this point, clearly missing from the FAC are any plausible facts that would suggest a drop in the OMI token price was *caused* by the news generated by the *BusinessDesk* article as opposed to being caused by the general crash of the industry and/or news of the crash of the crypto asset and NFT market generally.  *See* ECF No. 27 at 7–10; *see also* Exs. 8–23 to ECF No. 27.

For its part, the FAC attempts to explain this lack of price drop immediately following the "reveal" of the New Zealand Action by claiming: "the *BusinessDesk* article was behind a paywall

and was slow to be disseminated to OMI holders, but eventually many found out." *See* ECF No. 23 at ¶41. Yet notably absent from the FAC are any specific allegations of how or when the OMI token holders "eventually found out." There is no reference to any blog, news article, or social media post reacting to the news of the New Zealand Action. Indeed, what references the FAC does contain are with regard to the Singapore Litigation only and predate the alleged downturn by months or even more than a year (during which time the OMI token was largely in an uptrend). Critically, there is not a single reference to any publication, anywhere, that belatedly delivered the news of the New Zealand Action to OMI token holders.

## III.  LEGAL ARGUMENT

### A.   LEGAL STANDARD

"To survive a motion to dismiss, the [FAC] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quotations omitted).

"[C]laims under section 10(b) and Rule 10b-5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action."). Under FRCP 9(b), Plaintiffs must "state with particularity the circumstances constituting

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

fraud or mistake." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

**B.**    **PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD SECURITIES FRAUD PURSUANT TO RULE 10B-5**

To state a claim for private securities fraud, plaintiff must allege facts sufficient to show that: (i) defendant made a material misrepresentation or omission of fact; (ii) with scienter; (iii) in connection with the purchase or sale of a security; (iv) on which plaintiff relied; (v) and which caused plaintiff loss ("loss causation"); and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

**1.**    **Plaintiff Has Failed to Adequately Plead Loss Causation**

Loss causation is the causal connection between defendant's material misrepresentation and plaintiff's loss. In the Ninth Circuit, FRCP 9(b)'s heightened standard requiring particularity "applies to all elements of a securities fraud action, including loss causation." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605. The Ninth Circuit recently held that, to plead loss causation by relying on one or more public disclosures, a plaintiff must show that:

> (1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) **disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate. At the pleading stage, the plaintiff's task is to allege with particularity facts "plausibly suggesting" that both showings can be made.**

*Hous. Mun. Emps. Pension Sys. v. BofI Holding*, 977 F.3d 781, 791 (9th Cir. 2020) (citations and quotations omitted) (emphasis added).

Ultimately, a securities fraud plaintiff must plead that the defendant's misrepresentation was a "substantial cause" of his or her financial loss. *In re Daou Sys., Inc.,* 411 F.3d 1006, 1025 (9th Cir. 2005). At the pleading stage, the plaintiff must allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectation, or other unrelated factors. *Metzler*, 540 F.3d at 1062.

"In other words, the plaintiff must plausibly allege that the defendant's fraud was '*revealed* to the market and *caused* the resulting losses." *Loos v. Immersion Corp.,* 762 F.3d 880, 888 (9th Cir. 2014) (quoting *Metzler*, 540 F.3d at 1063) (emphasis in original).

Lower stock prices "may reflect not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 343. "In a securities case, this standard requires the plaintiff to show that the defendant's fraud – and not other events – caused the security's drop in price." *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 550 (8th Cir. 2008) (citation omitted) (dismissing securities fraud claim for failure to plead loss causation when plaintiff could not show that loss in value of security was attributable to the revelation of fraudulent conduct).

Loss causation is a "variant of proximate cause," and turns on "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd,* 811 F.3d at 1210 (finding causation sufficiently plead where share price fell and never recovered). The central inquiry is whether a plaintiff's loss was caused by "the very facts about which the defendant lied." *Wochos v. Tesla,* 985 F.3d 1180, 1197 (9th Cir. 2021) (quotations omitted).

A court may find loss causation allegations insufficient where there is a drop in stock prices that coincide with the disclosures of certain news but then the price "recover[s] very shortly after." *Wochos,* 985 F.3d at 1197 (quotations omitted) (dismissing claims when pleadings alleged a fall in stock price that was followed by a recovery).

Here, Plaintiff has not plausibly pled "the decline in the defendant's [asset] price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos,* 762 F.3d at 887; *see also Dura Pharm, Inc. v. Broudo,* 544 U.S. 336, 342–43 (2005) (noting a "tangle of factors affect[] price").

a.   **Plaintiff Has Failed to Plead Loss Causation Because the Precipitous Drop of OMI Tokens Began 6 Weeks Prior to the Publication of the *BusinessDesk* Article**

The majority of the purported loss of OMI token value is alleged to have occurred within the six weeks prior to the publication of the June 7, 2022 *BusinessDesk* article. The FAC implausibly attempts to connect the later disclosure of the alleged fraud to the pre-existing six-week price drop.

The OMI token, like much of the crypto asset and NFT market, experienced a precipitous

Snell & Wilmer

L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1   drop from late April 2022 to approximately July 2022.  Applied to the OMI token, six weeks prior

2   to the publication of the *BusinessDesk* article, OMI was trading as high as $0.0029, but by June 6,

3   2022, OMI trading closed at $0.0015.  Ex. 6 to ECF No. 27, CoinMarketCap Chart for Omi Tokens.

4   Plaintiff seeks to blame this drop on the news of the New Zealand Action, which, according to

5   Plaintiff, was not publicly disclosed until June 7, 2022.  This contention is not only impossible

6   given the temporal realities of causation, it is also legally recognized as inadequate for purposes of

7   pleading loss causation.

8       It is insufficient to plead loss causation for the "drop in the defendant's stock that occurred

9   prior to the [disclosure] because those losses took place 'before the revelations began…, when the

10  true nature of [the defendant's] financial condition had not yet been disclosed.'"  *Metzler,* 540 F.3d

11  1062–63 (citations omitted).  Loss causation is only established "if the market learns of a

12  defendant's fraudulent act or practice, the market reacts to the fraudulent act or practice, and a

13  plaintiff suffers a loss as a result of the market's reaction."  *In re Oracle Corp. Secs. Litig.,* 627

14  F.3d 376, 392 (9th Cir. 2010) (citation omitted).

15      The FAC inexplicably alleges the price drop for OMI tokens began in or around late April

16  or early May 2022 (when OMI tokens were trading at a range of $0.0020-$0.0027) on account of

17  an article that was not published until June 7, 2022.  *See* Ex. 7 to ECF No. 27, Historical Listing of

18  OMI Token Price.  Specifically, the FAC points to "news of the litigation" reaching insiders as

19  weakening the market prior to June 7, but likewise does not say what exactly constituted such

20  "news," or when it was made public.  *See* ECF No. 23 at ¶43.  Similarly, the FAC does not say

21  what—if any—development took place roughly six weeks prior to the *BusinessDesk* article that

22  would have caused "[n]ews of the litigation . . . [to] spread among ECOMI insiders" significant

23  enough to cause the price to trend downward.  *See id.*  On the face of the FAC, the only plausibly

24  material events to occur within the approximately seven-week period identified by Plaintiff was the

25  issuance of the June 1, 2022 order and its discussion in the June 7 *BusinessDesk* article.  *See* Exs.

26  4–5 to ECF No. 27.

27      It is not possible for the market to react to a disclosure that was yet to happen.  Plaintiff's

28  theory of loss causation fails on these grounds alone.

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**b.** **The FAC Fails to Allege The *BusinessDesk* Article Is Causally Linked to a Drop In OMI Token Value**

If the Court looks at what happened at the time the *BusinessDesk* article was published, the historical pricing information reveals the OMI token price did not fall for several days following the June 7, 2022 publication. *See* ECF No. 27 at 7–10. Indeed, the OMI token price did not materially drop on June 7, 2022, but increased on June 8, 2022 and stayed steady on June 9, 2022. *Id.* At the same time, there was no marked increase in the daily trading volume of the OMI token either on June 7, 2022, or in the days that followed, that would indicate the market was trading more based on the information at issue. *Id.* To the contrary, the daily trading volume of OMI was in a downtrend during that period and continued to fall on June 7 and in the days that followed. *See* Ex. 6 to ECF No. 27, CoinMarketCap Chart for Omi Tokens. In other words, not only did the price increase following what Plaintiff claims to be a price decreasing event, but all indications are that the market had no actual response to the article whatsoever.

It was not until many days after the publication, i.e. mid-to late June 2022, that the closing price fell to $0.001129-$0.001257. Ex. 7 to ECF No. 27 (OMI price listings for June 16 – June 21, 2022). However, the volume trading data reveals that the trading activity was not anything out of the ordinary. Ex. 6 to ECF No. 27 (OMI trading volume data for June 7–June 21, 2022).

The FAC attempts to explain the sluggish price drop by saying the market was "slow" to react, but, when the OMI token holders "eventually" found out, they were "drastic" with their reaction. *See* ECF No. 23 at ¶41. This allegation is far too conclusory to be accepted as true. At the same time, the FAC omits the fact that OMI's price moved in near lockstep with comparable assets, right down to the claimed downturn in the weeks prior to the *BusinessDesk* article, the selectively chosen declines following that article's publication, and even the overall decline, which is roughly the same as hundreds, if not thousands, of other assets during the same period of time. *See* ECF No. 27 at 7–10[1].

A complaint fails to adequately plead loss causation when a more plausible reason exists

---

[1] The crypto asset market cratered during the 6–7-week time period. Exhibits 6–17 to ECF No. 27 includes S&P Dow Jones Indices tracking key crypto markets as well as data tracking the market cap of all crypto assets that mirror the downturn experienced by OMI.

that explains a securities' price history. *See Metzler,* 540 F.3d at 1065 (dismissing a complaint on motion to dismiss when defendants provided "a far more plausible reason for the resulting drop in [company's] stock price.").

The FAC pleads no particular facts that plausibly suggest the market took until mid-June to become aware of the New Zealand Action. Plaintiff references no blogs, YouTubers, Reddit.com posts, or other media that refer to the New Zealand Action following the *BusinessDesk* publication. This is in stark contrast to the media references the FAC provides regarding the Singapore Action.

Further, the OMI token price quickly recovered and was above the June 7, 2022 price by July 7, 2022. *See* ECF No. 27 at 7–10. Indeed, the high in July was $0.001988 (18% higher than the June 7, 2022 price) and the OMI token price stayed elevated for several weeks thereafter. *Id.* The Ninth Circuit has rejected loss causation allegations in similar circumstances. *See Metzler,* 540 F.3d at 1065 (no loss causation where just days later, "stock quickly recovered" from the drop following a *Financial Times* article)*; Loos,* 762 F.3d at 889 (citation omitted); *Wochos,* 985 F.3d at 1197 (no loss causation where stock price quickly recovered). The OMI tokens' quick price recovery is likely why Plaintiff (implausibly) pled the price drop began six weeks prior to the publication of the *BusinessDesk* article – OMI tokens were then trading between $0.0020-$0.0027.

It is far more plausible the April to mid-June 2022 drop in the OMI token price was due to prevalent market factors and not the New Zealand Action. The news was replete with articles regarding the failing crypto asset and NFT market during this time and the NFT and crypto market suffered substantial losses in 2022 and cratered during this 6–7-week time frame. *See* Exs. 18–23 to ECF No. 27. Further, other prominent crypto assets and similar NFT related coins also experienced precipitous drops during this time period. *See* Exs. 8–17 to ECF No. 27. The market crashed in 2022 and OMI's price drop was not plausibly due to the existence of the New Zealand Action.

### 2.    Plaintiff Has Failed to Adequately Plead Materiality

"Central to a 10b-5 claim is the requirement that a misrepresentation or omission of fact must be material." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010). A statement is

material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1976) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

To plead materiality, the FAC's allegations must "suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (quoting *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678) (internal citations and quotation marks omitted).

Here, there are no allegations plausibly suggesting the New Zealand Action was material to a reasonable investor.   There is nothing in the FAC to suggest the New Zealand Action "significantly altered the 'total mix' of information made available" regarding Ecomi or its OMI token.   *See Levinson*, 485 U.S. at 231–32.   The FAC is devoid of any allegations regarding the effect a mere pending litigation had on Ecomi, its operations or the operations and success of the VeVe marketplace.

The FAC attempts to plead materiality by misleadingly quoting both the *BusinessDesk* article and the June 2, 2022 judgment from the New Zealand Action.   The FAC alleges "on information and belief" that the two actions were "closely related".   However, as the documents themselves reveal, the New Zealand Action and the Singapore Action were distinct claims.   *See* Exs. 4–5 to ECF No. 27.   The New Zealand Action was not material to the Singapore Action and nothing in the FAC plausibly alleges it was.

**3.      Plaintiff Has Failed to Adequately Plead Falsity**

A plaintiff must specifically allege why each statement meets each element of section 10(b) and Rule 10b-5, including the misrepresentation made. *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605. The Plaintiff must particularly plead how the statement made was false and misleading. *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir.2002).   "Thus, in order to survive a motion to dismiss under the heightened pleading standards of the PSLRA, the plaintiffs' complaint must specify the reason or reasons why the statements made by [the defendant] were misleading or

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

16

untrue . . . ." *Id.* at 1006 (citations omitted).

Additionally, Rule 10b-5 "does not contain a freestanding completeness requirement." *Id.* "Further, a completeness rule such as [plaintiffs] suggest could implicate nearly all public statements . . . . No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.*

The only purported misrepresentation made to Plaintiff by Godenzi was Godenzi's statement that his payment dispute with Ecomi settled. ECF No. 23 at ¶¶1, 43 ("but unfortunately the [Ecomi] team didn't pay our contract for a year which led to a lawsuit and of course a settlement."). This statement made by Godenzi was entirely true. While Godenzi did not mention the separate unrelated New Zealand Action between MB Technology and Orbis, there is no information in the FAC that would plausibly suggest the New Zealand Action was material to the Singapore Action. Nor is there any suggestion that the New Zealand Action was material to Ecomi's operations or the operations of the VeVe marketplace.

Plaintiff's FAC also references a separate statement made by Godenzi on a chat published in a YouTube video regarding the payment for services dispute being resolved. *Id.* at ¶30. Again, this is true and there is nothing in the FAC that explains how this statement was false or misleading. The FAC also refers to statements made by Godenzi, namely, that the parties had "moved on" and parted "amicably." *See id.* (emphasis omitted). However, these are vague and not actionable words. "'Vague, optimistic statements' are 'not actionable,' so these statements cannot qualify as a misrepresentation." *In re Sona Nanotech, Inc. v. Sec. Litig.*, 562 F. Supp. 3d 715, 725 (C.D. Cal. 2021) (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) and citing *Wochos*, 985 F.3d at 1192). Godenzi's subjective opinion statements regarding the "amicable" state of his relationship with Ecomi are not definitive enough to be actionable for fraud.

### 4.     Plaintiff Has Failed to Adequately Plead Scienter

The PSLRA has an exacting standard for pleading scienter in the federal securities fraud context. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020). To establish liability a private plaintiff must plead that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

(2007).  The facts plead in the complaint must give rise to a "strong inference" the defendant acted with the requisite state of mind.  *Endologix, Inc.,* 962 F.3d at 414.

"The PSLRA's 'strong inference' requirement has teeth.  It is an 'exacting' pleading obligation." *Id.* (quoting another source).  "[T]he Supreme Court has held that under the PSLRA's 'strong inference' standard, a complaint will survive a motion to dismiss 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* at 414 (quoting another source).

To adequately plead "the critical element of scienter," the Ninth Circuit requires a complaint "allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Endologix, Inc.*, 962 F.3d at 414 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).  Deliberate recklessness entails "an extreme departure from the standards of ordinary care," one that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (quoting *Schueneman*, 840 F.3d at 705) (emphasis in original) (internal citation and quotation marks omitted).  More specifically, "although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness." *Silicon Graphics*, 183 F.3d at 974 (emphasis in original).

The plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners*, 552 F.3d at 991 (quoting *Silicon Graphics*, 183 F.3d at 976 (internal citations and quotation marks omitted)).

Here, the FAC is devoid of any substantive allegations regarding Godenzi's personal intent to deceive or manipulate.  The only allegation regarding the intent to deceive is at paragraph 85 of the FAC: "Godenzi made these false representations with the intent to induce Hable to buy OMI in reliance on the statements."  This statement is conclusory.  The more plausible explanation is that Godenzi's statements were truthful and innocent and were not made as part of a scheme to induce

18

purchases of OMI tokens.  This is particularly true when there is no plausible allegation that the New Zealand Action affected the price of OMI tokens or had any impact on the success of the VeVe marketplace or Ecomi's operations.  Without any plausible allegations regarding Godenzi's state of mind, the claims for federal securities fraud fail as a matter of law.

### 5.    Plaintiff Has Failed to Adequately Plead Reliance

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the §10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists . . . ."  *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 159 (2008) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1159 (9th Cir. 1996) ("Justifiable reliance 'is a limitation on a rule 10b–5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm.'" (quoting another source); *see also ScripsAmerica, Inc.*, 119 F. Supp. 3d 1240–41.

Here, the FAC does not adequately plead Plaintiff's reliance on the statements made by Godenzi.  The few allegations that do exist in the FAC, are only conclusory recitations of legal conclusions.  *See* ECF No. 23 at ¶73 ("Hable relied on Godenzi's misstatements when purchasing OMI from him, and Hable's reliance was reasonable").  Further, as stated in the loss causation analysis, there is no indication that statements or omissions made by Godenzi are causally linked to any loss purportedly suffered by Plaintiff.

### C.    PLAINTIFF'S SECURITIES CLAIMS ALSO FAIL BECAUSE THE SECURITIES LAWS DO NOT APPLY TO EXTRATERRITORIAL CONDUCT

Plaintiff's securities claims also fail because they are an impermissible extraterritorial application of law.  It is well-settled that the Securities Act only reaches transactions in securities listed on domestic exchanges, and domestic transactions in other securities.[2]  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267–68 (2010) ("[t]he . . . focus on domestic transactions is evident in the Securities Act of 1933.").

---

[2] For the avoidance of doubt, Godenzi does not concede that the OMI token is a security under federal law, or Nevada's Blue Sky law.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Because Plaintiff does not allege a transaction in an asset listed on domestic exchanges, he necessarily relies on the existence of a "domestic transaction" under *Morrison*. A transaction is domestic if irrevocable liability is incurred or title passes within the United States. *See Stoyas v. Toshiba Corp.*, 896 F.3d 933, 948 (9th Cir. 2018) (citation omitted). Beyond his mere conclusory allegation later in the FAC, Plaintiff alleges that this standard is met because "Plaintiff bought ECOMI tokens from Benn Godenzi in December 2021 and January 2022 in exchange for $12 million while Godenzi was in Nevada, his home." ECF No. 23 at ¶1.

Yet Plaintiff's FAC is replete with allegations showing that the transaction was extraterritorial. For example, Plaintiff alleges that he is a "German national resident in Portugal," while offering no indication of where he physically was at the time of the purchase. *Id.* at ¶4. Moreover, Plaintiff argues that OMI *fails* to have the very domestic touchpoints material to this analysis, claiming that "[b]ecause it is issued by a non-U.S. company without any known meaningful targeting of the U.S. market, OMI is not required to be registered as a security with the Securities Exchange Commission and nothing in this Complaint alleges that Ecomi violated any laws, let alone U.S. securities laws." *Id.* at ¶53. In other words, the FAC claims that while transactions of OMI fall within the Securities Act for purposes of this lawsuit, OMI is decidedly foreign for purposes of falling outside of the SEC's Securities Act jurisdiction. Oddly, Plaintiff cites *Stoyas* in support of this proposition, but that opinion offers no support for the remarkable claim that a plaintiff may allege that an asset is a security for purposes of a private claim, but not for purposes of public oversight and regulation under the same laws.

The only discernable allegation in Plaintiff's FAC that this transaction had any connection to the United States at all is the claim that because one side of an over-the-counter digital asset sale allegedly involved Mr. Godenzi while he was physically in Nevada, he "incurred irrevocable liability to deliver OMI tokens while within the United States." *Id.* (citing *Stoyas*, 896 F.3d 933). Yet looking again to Plaintiff's own authority (*Stoyas*), the Ninth Circuit has reasoned that the question of whether irrevocable liability exists depends upon such factual allegations as "contract formation, placement of purchase orders, passing of title, and the exchange of money." *Stoyas*, 896 F.3d at 949. To that end, *Stoyas* involved numerous U.S. touchpoints such as the involvement of a

U.S. brick-and-mortar financial institution, related U.S. corporate entities and U.S. headquarters, U.S. executives, U.S. offices, and U.S. agents. *See id.*

Here, the FAC simply alleges that a German national resident in Portugal allegedly bought tokens "issued by a non-U.S. company without any known meaningful targeting of the U.S. market" (and outside of the SEC's jurisdiction) from an Australian national while he was in Nevada, allegedly hired by a Singaporean company (Ecomi) through his British Virgin Islands non-party company MB Technology. *See* ECF No. 23 at ¶¶1–5. Strikingly, the FAC is silent on *every* detail of the sale beyond price and quantity, failing to even allege that Mr. Godenzi was in physical possession of the OMI tokens at issue (as opposed to some other non-U.S. entity), or that he personally received the proceeds of the sale—material information that would be known to Plaintiff, that he could readily plead, and that would be to his benefit to plead, if true.

In fact, in one of the only new allegations contained in the FAC, Plaintiff offers alleged communications strongly suggesting that Mr. Godenzi *was not* the ultimate seller. Specifically, Plaintiff now alleges the existence of communications noting that the price was expressly based on what "[Godenzi's] 'team' had 'agreed to'" and indicating that MB Technology was the ultimate decisionmaker on the terms of the deal ("*they* won't be doing more than 1b [the same volume] for now.'"). *Id.* at ¶45.

Plaintiff's thin allegations on the details of the transaction do not and cannot establish his entitlement to relief under U.S. state and federal securities law. Indeed, the adequacy of pleadings even more detailed than Plaintiff's was rejected recently by the Southern District of New York in *Anderson v. Binance*, No. 1:20-cv-2803 (ALC), 2022 WL 967824 (S.D.N.Y. Mar. 31, 2022). *Binance* was a class action premised on transactions alleged to take place between U.S. persons and non-U.S. digital asset exchange Binance. *Id.* at *4–5. The *Binance* plaintiffs summarily alleged that tokens were purchased "from" the U.S. where plaintiff purchasers resided, and that "title" for the tokens "passed in whole or in part over servers located in California that host Binance's website." *Id.* at *4. Put differently, *Binance* addressed the question of whether an alleged securities transaction with just one U.S. side was sufficient under *Morrison*—the question before this Court. The *Binance* Court held that such "transactions . . . cannot qualify as domestic,"

and that "Plaintiffs must allege more than stating that Plaintiffs bought tokens while located in the U.S.[.]" *Id.* In support of its holding, the court looked to precedent that a "trade is not considered domestic on the basis that the purchaser 'places a buy order in the United States for the purchase of foreign securities on a foreign exchange.'" *Id.* (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187 (2d Cir. 2014)).

Insomuch as the *Binance* plaintiffs *also* raised claims under Nevada's Blue Sky law (in addition to other jurisdictions), the court held that "the claims brought under California, Florida, Nevada, Puerto Rico, and Texas are also dismissed on account of the extraterritorial nature of the transactions at issue," reasoning that "[c]ourts often analyze Blue Sky laws in relation to their federal counterparts." *Id.* at *5 (citation omitted). For these reasons, the Southern District of New York concluded that "as the federal claims fail due to extraterritoriality, the state claims are also dismissed because the relevant laws do not apply extraterritorially." *Id.* Against this backdrop, Plaintiff's threadbare allegations regarding the nature of the transaction are insufficient to entitle him to relief under domestic securities law. For this reason, too, Plaintiff's federal and state securities claims must be dismissed.

## D. PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD SECURITIES FRAUD PURSUANT TO NRS 90.570(2)

Additionally, while Nevada has not adopted the same pleading requirements of the PSLRA, the heightened pleading requirements for FRCP 9(b) nevertheless apply. *See G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 460 F. Supp. 2d 1246, 1260 (2006). NRS 90.570(2) provides that:

> In connection with the offer to sell, sale, offer to purchase of a security, a person shall not, directly or indirectly: . . . 2. Make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made.

A private right of action under NRS 90.570(2) must also comply with the additional requirements of NRS 90.660(2)(b), which requires defendant's knowledge of falsity.

As established hereinabove, Plaintiff has failed to plead the required elements of fraud, including materiality, falsity and loss causation. None of these elements have been sufficiently

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

plead under the heightened pleading standards of FRCP 9(b) and thus Plaintiff's claim for violation of NRS 90.570(2) must also fail.

Further, because OMI is not a security, remedies under Nevada's security laws such as NRS 90.570(2) are not available to Plaintiff.

### E.   PLAINTIFF HAS FAILED TO ADEQUATELY PLEAD COMMON LAW FRAUD

To state a claim for fraud, a plaintiff must allege: (1) a false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation. *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998) (citation omitted).

To plead a prima facie case of fraudulent concealment under Nevada law, a plaintiff must allege five elements:

> (1) the defendant concealed or suppressed a *material* fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant, intentionally concealed or suppressed the fact with the intent to defraud the plaintiff; that is, the defendant, concealed or suppressed the fact for the purpose of inducing the plaintiff to act differently than she would have if she had known the fact; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; and (5) and, as a result of the concealment or suppression of the fact, the plaintiff sustained damages.

*Leigh-Pink v. Rio Props., LLC*, 512 P.3d 322, 325–26 (Nev. 2022) (internal citation and quotation marks omitted).

Not only is an actual misstatement or omission required, but the misstatement or omission must be *material* to be actionable. *Id.* Further, the loss sustained by the plaintiff must be causally linked to the fraudulent misstatement. *Id.* at 327 (citing a line of cases that require damages to be a direct and proximate result of the fraudulent misstatement or omission). As stated by the *Leigh-Pink* Court:

> This survey of caselaw is clear: a common-law fraudulent concealment claim requires a plaintiff to demonstrate that they either did not receive the benefit of the bargain or show out-of-pocket losses caused by the defendant's alleged misrepresentation. An action of concealment does not, in and of itself, lead to a cognizable injury under the common law; instead, a corresponding showing that

Snell & Wilmer
L.L.P.
LAW OFFICES
1883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1    such concealment caused the plaintiff cognizable damages is required.

2    *Id.* (citations omitted).

3          As stated herein above, Plaintiff cannot establish his claim for fraud.  Plaintiff has not

4    adequately pleaded that any materially false or misleading statements were made to him.  Nor has

5    Plaintiff asserted any causal link between the purportedly false statements and his alleged damages.

6    Further, the FAC fails to allege any particular facts that would plausibly suggest Godenzi had the

7    requisite fraudulent intent.  For all these reasons, Plaintiff's claim for common law fraud fails.

8                              **IV.  <u>CONCLUSION</u>**

9          In light of the foregoing, Defendant, Benn Godenzi, respectfully requests the instant Motion

10   be granted in its entirety and the FAC dismissed without leave to amend.

11   DATED this 17th day of March 2023.          SNELL & WILMER L.L.P.

12                                          */s/ Charles E. Gianelloni*
13                                          Charles E. Gianelloni (NV Bar No. 12747)
                                            Alexis R. Wendl (NV Bar No. 15351)
14                                          3883 Howard Hughes Parkway, Suite 1100
                                            Las Vegas, Nevada 89169
15                                          Telephone: (702) 784-5200

16                                          Rebecca L. Castaneda, Esq.
                                            *Admitted Pro Hac Vice*
17                                          THE CASTENADA LAW FIRM, PLLC
                                            506 North Armenia Avenue
18                                          Tampa, FL 33609
                                            Telephone: (813) 694-7780

19                                          Michael Jason Lee, Esq.
                                            *Admitted Pro Hac Vice*
20                                          LAW OFFICES OF MICHAEL JASON LEE, APLC
                                            4660 La Jolla Village Drive, Suite 100
21                                          San Diego, CA 92122
                                            Telephone: (858) 550-9984

22
23                                          *Attorneys for Defendant Benn Godenzi*

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, I electronically filed the foregoing **DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT** with the Clerk of Court for the U.S. District Court, District of Nevada by using the Court's CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

DATED this 17th day of March 2023.

_____
An Employee of Snell & Wilmer L.L.P.

25